# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THERESA LISHAMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 6159 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Theresa Lishamer, brings this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*, claiming that while employed by defendant Wal-Mart Stores, Inc. ("Wal-Mart"), she was not promoted and she was paid less than male co-workers as a result of intentional sex discrimination. Defendant has moved for summary judgment. For the following reasons, defendant's motion is granted in part and denied in part.

## BACKGROUND[1]

Plaintiff Theresa Lishamer worked at Wal-Mart from January 13, 2001, until July 17, 2007. (Pl.'s LR 56.1 Resp. ¶¶ 1, 7, 45, ECF No. 41.) She had previously worked as a certified

---

[1] The following facts are taken from plaintiff's Local Rule 56.1(b) Response to Defendant's Local Rule 56.1(a) Statement of Material Facts, as well as plaintiff's Local Rule 56.1(b) Statement of Additional Material Facts. Defendant objects to these documents, arguing that they do not comply with Local Rule 56.1, but the Court finds that, on the whole, plaintiff's Local Rule 56.1 materials achieved their purpose of aiding the Court by directing it to evidence in the record that supports plaintiff's position. Defendant also objects to certain facts in plaintiff's Local Rule 56.1 materials as inadmissible on evidentiary grounds, including failure to authenticate, but at the summary judgment stage evidence need only be admissible in substance rather than form, *see Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("'To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" (quoting *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010))), and plaintiff is likely to be able to cure these problems at trial. For these reasons, defendant's objections are overruled.

nurse's aide and a line technician soldering circuit boards. (*Id.* ¶ 6.) Plaintiff's highest level of education is a GED. (*Id.*)

Plaintiff began her employment at Wal-Mart as a cashier in the DeKalb, Illinois store, earning a wage of $7.25 per hour. (*Id.* ¶¶ 7-8.) After a few months, in May 2001, she moved to a backroom position on the inventory control team, where she was responsible for unloading semi-trailers and distributing merchandise to the individuals responsible for stocking the shelves. (*Id.* ¶ 9.)

Like plaintiff, one of plaintiff's co-workers, Eric Hall, was hired as a cashier in early 2001 and then moved to the inventory control team after a few months. (*Id.* ¶¶ 29-30.) In October 2001, he became a Department Manager of Automotive, and after six months, he was selected to participate in Wal-Mart's Management in Training ("MIT") program. (*Id.* ¶¶ 30-31.) The MIT program prepares candidates to become assistant managers, who supervise department managers and report to store managers, through classroom and hands-on experience. (*Id.* ¶¶ 13, 15.)

At a morning meeting on June 13, 2002, store manager Tom Kehrees announced that anyone interested in becoming an assistant manager should speak to him afterward. (*Id.* ¶ 10.) Later that day, plaintiff approached Kehrees in his office and informed him of her interest in an assistant manager position. (*Id.*) Kehrees responded that plaintiff would never be promoted as long as he is store manager. (*Id.* ¶ 11.) Plaintiff asked why, and Kehrees responded that it was because he did not like the way she dressed. (*Id.*) Plaintiff, who wore jeans and a T-shirt while she worked on the inventory control team, replied, "I unload semis all day long, and I am not going to wear my dress clothes to go back and unload a semi." (Olawsky Decl., Ex. 2, Lishamer Dep. at 40:18-20, ECF No. 42-1.) Later that same day, a male inventory control co-worker,

whose name plaintiff can no longer remember but who, she recalls, was wearing a suit and tie, told her that he had just been promoted to the MIT program. (Pl.'s LR 56.1 Resp. ¶ 12.) After reviewing records, plaintiff believes the male co-worker was Jeff LeRette. (Pl.'s Stmt. of Add'l Facts ¶ 10, ECF No. 41.)

Upset about Kehrees's comments, plaintiff spoke to Market Manager Ronny Hayes. (Pl.'s LR 56.1 Resp. ¶ 20.) A market manager is responsible for supervising a cluster of several stores within a specified geographic area; store managers such as Kehrees report to a market manager. (*Id.* ¶ 15.) Hayes suggested that plaintiff go to the St. Charles, Illinois store to interview with a Sherry Hayes (no relation to Ronny) for a department manager position. (*Id.* ¶ 20.) Ronny told plaintiff that if she wanted to be recommended for the MIT program and become an assistant manager, she would have to prove herself by running a department successfully for six months. (*Id.*) The following day, plaintiff went to the St. Charles store to meet with Sherry, and Sherry immediately offered plaintiff a position as the Department Manager of Stationery. (*Id.*) Plaintiff started in her new position the next day. (*Id.*)

In December 2002, after excelling as Department Manager of Stationery for six months, even winning an Award of Excellence, plaintiff asked Ronny Hayes about the MIT program. (Pl.'s Stmt. of Add'l Facts ¶¶ 22-23.) Hayes told plaintiff that he could not promote plaintiff at that time because she was too valuable to the store as manager of her department. (*Id.* ¶ 23.) In 2004, Jason Bova, who worked across the aisle from plaintiff as Department Manager of Paper Goods, received a promotion to the MIT program. (*Id.* ¶ 24.) Bova had worked at Wal-Mart since 1994 (*see* Olawsky Decl., Ex. 21, Letter for Re-Admission), much longer than plaintiff, but they had the same job title, job code, and reported to the same assistant manager (Pl.'s Stmt. of Add'l Facts ¶ 24.) In May 2002, Bova had submitted a "Letter for Re-admission" responding to

a third write-up from a supervisor for "less than desirable work habits and ethics." (*Id.*) Bova does not recall a formal application process for promotions; rather, he recalls that store management would select the people "they felt were worthy." (*Id.* ¶ 25.)

According to Daniel Ketcham, a Wal-Mart market manager in Illinois, it was generally a store manager's responsibility to "surface" candidates for the MIT program, although he recalls discussing the decision to promote associates to the MIT program not only with store managers but also with assistant managers or co-managers. (Olawsky Decl., Ex. 5, Ketcham Dep. at 21:25-24:7, 43:11-45:18, ECF No. 42-3.) Ketcham did not recall any written criteria for promoting associates to the MIT program, but generally store managers knew that they would be judged themselves based on the performance of the people they promoted, so they had an incentive to ensure that the people they recommended were dependable, reliable, hardworking, and high-performing individuals, with good interpersonal skills and light disciplinary records. (*Id.* at 22:7-15, 44:6-45:18.)

After she had been at the St. Charles store for about a year without receiving a promotion to the MIT program, plaintiff submitted a number of applications for management positions through Wal-Mart's Management Trainee Career Selection System. (Pl.'s Add'l Stmt. of Facts ¶ 36.) She was never promoted above the department manager level. (*Id.* ¶ 1.) Plaintiff believes that Wal-Mart discriminated against her by promoting Hall, LeRette, and Bova over her. (Pl.'s LR 56.1 Resp. ¶ 33.)

Plaintiff also believes that, at numerous points during her employment, Wal-Mart discriminated against her by paying her less than male co-workers or giving her fewer or less generous raises. (*Id.* ¶ 34.)

During the relevant time frame, according to Ketcham, Wal-Mart had "set guidelines" for setting pay rates for "new hired associates," which were not a matter of discretion. (Olawsky Decl., Ex. 5, Ketcham Dep. at 19:7-12, ECF No. 42-3.) Up to a certain point in time, a store manager could give employees "merit raises" at his discretion, upon the recommendation of a particular employee's assistant manager or co-manager. (*Id.* at 19:13-20:18.) Around the time that plaintiff began to work for Wal-Mart, although Ketcham cannot recall exactly when, Wal-Mart eliminated the discretionary "merit raise" system in favor of a system of regular raises for hourly employees, in amounts set by "base guidelines," based on their performance evaluations. (*Id.* at 35:14-36:5.)

Upon transferring to the inventory control department, Hall immediately received a fifty-cent raise, but plaintiff received only a thirty-cent raise, from $7.25 to $7.55. (Pl.'s Stmt. of Add'l Facts ¶ 4.) William Moon worked in inventory control at the DeKalb store with plaintiff, but his starting rate of pay there was $8.63 per hour, higher than plaintiff's. (*Id.* ¶ 5.) Within three months, his pay increased to $9.10 per hour, and then to $10 per hour the following month. (*Id.*) He later transferred to the St. Charles store to become a department manager, where he made $12 per hour. (*Id.* ¶ 31.) Kevin Schultz also worked in inventory control at the DeKalb store with plaintiff, but he started there at $8.32 per hour. (*Id.* ¶ 6.) Plaintiff received a fifty-cent raise after three months in inventory control, from $7.55 per hour to $8.05, then a forty-five cent raise to $8.50 after another five and a half months. (*Id.* ¶ 1.)

Several male department managers at the St. Charles store received raises within approximately ninety days of promotion. (*Id.* ¶ 29.) Matt Heth received a fifty-cent raise, Daniel Browne received a forty-cent raise, Daniel Escobedo received a forty-cent raise, Bova received a forty-two-cent raise, and John O'Brien received a forty-eight-cent raise. (*Id.* ¶¶ 1, 29.) Plaintiff

received a $1.50 raise upon promotion, but she did not receive another raise after three months; her next raise was not for approximately seven months. (*Id.* ¶ 1.) Kurt Anderson received an increase of $1 per hour within four months of being hired as a department manager, raising his pay rate forty-two cents per hour above plaintiff's. (*Id.* ¶ 32.) In the five years O'Brien served as a department manager, his pay increased by $3.24 per hour; plaintiff's increased by only $2.35. (*Id.* ¶ 33.)

Plaintiff also claims that her fiancé, Colin Matthews, was treated differently by Wal-Mart. Matthews, who had five years of experience as a manager at several different gas stations, was hired into Wal-Mart's Management in Training ("MIT") program as a trainee manager for the Tire Lube Express ("TLE") department at the Plano, Illinois store. (Pl.'s LR 56.1 Resp. ¶¶ 37-38.) However, for personal reasons, he stepped down from the program and worked as a stocker, cashier, and greeter. (*Id.* ¶¶ 37, 39.) Matthews had several leg surgeries, which limited his mobility, and as an accommodation, Wal-Mart moved him to various positions with job duties that his physical condition permitted him to perform. (*Id.* ¶ 39.) Wal-Mart allowed Matthews to keep the high rate of pay at which he had started, even after he had dropped out of the MIT program to work in lower-level positions. (Pl.'s Stmt. of Add'l Facts ¶ 35.)

## ANALYSIS

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, the court may not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). On a defendant's motion for summary judgment in an employment discrimination case, "the correct standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court must consider the evidence as a whole to determine whether the full evidentiary picture permits a reasonable inference that plaintiff's sex caused defendant to pay plaintiff less than similarly situated men or fail to promote her. *See Ortiz*, 834 F.3d at 765; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Whether the evidence is direct or circumstantial, "the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The central question at issue is whether the employer acted on account of the plaintiff's [sex or other protected characteristic].")).

Plaintiff claims that Wal-Mart discriminated against her in two ways: (1) refusing to promote her from an hourly-paid position to a higher-level management position because of her sex, and (2) paying her less than similarly situated male employees.

## I.    FAILURE TO PROMOTE

"To demonstrate a prima facie case for a failure to promote claim, the plaintiff must show that: (1) she is a member of a protected group; (2) she applied for and was qualified for the position; (3) she was rejected for the position; and (4) those who were promoted had similar or

lesser qualifications for the position, or other evidence from which one can infer that the plaintiff was denied promotion for a discriminatory reason." *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998).

Plaintiff claims that Wal-Mart discriminated against her by failing to promote her to the MIT program or to other management positions to which she applied. As described above, the evidence shows that the decision to promote to the MIT program was driven by store managers, who were responsible for "surfacing" candidates. (Olawsky Decl., Ex. 5, Ketcham Dep. At 21:25-24:7, 43:11-45:18, ECF No. 42-3.) "Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a *prima facie* case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000), *overruled on other grounds by Ortiz*, 834 F.3d at 765-66. Therefore, the Court considers Wal-Mart's refusal to promote plaintiff from the DeKalb store first, and then separately considers Wal-Mart's refusal to promote plaintiff from the St. Charles store.

### A. Failure to Promote from DeKalb Store Over Jeff LeRette and Eric Hall

Defendant argues that plaintiff cannot prove that she was passed over for promotion as a result of intentional discrimination because (1) Kehrees's comments about plaintiff's attire were facially sex-neutral and do not show that he refused to promote plaintiff because she is a woman, and (2) plaintiff cannot prove that men who were no better qualified than she were promoted ahead of her. According to defendant, LeRette is not a valid comparator because plaintiff does not provide sufficient information about him (in fact, she is not even certain that he is actually the one who she remembers being promoted ahead of her), and Hall is not a valid comparator

because he was promoted to the MIT program from the position of Automotive Department Manager, where he had a different supervisor and different job responsibilities.

A supervisor's remark that an employee must conform to a particular sex stereotype in order to be promoted "can certainly be evidence that gender played a part" in a refusal to promote an otherwise qualified employee. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 235, 250-51 (1989) (supervisors criticized employee seeking promotion for being "macho" and using profanity and advised her to "walk more femininely, talk more femininely, wear make-up, have her hair styled, and wear jewelry" in order to earn promotion). As the United States Supreme Court has explained,

> we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for "'[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" *Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 707 (1978), quoting *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1198 (7th Cir. 1971).

*Price Waterhouse*, 490 U.S. at 250-51 (internal citations altered). Plaintiff asserts that Kehrees told her he would not promote her because he did not like the way she dressed. She testified at her deposition that she wore jeans and a T-shirt while working as an inventory control specialist, and even Kehrees admitted that that was normal attire for employees in that position. (Olawsky Decl., Ex. 8, Kehrees Dep. at 39:6-7.) Given that there was apparently nothing unusual or inappropriate about plaintiff's attire for an inventory control specialist performing warehouse work, a reasonable factfinder could interpret Kehrees's comment as an admission that he refused to promote plaintiff based on her failure to dress or behave in a traditionally feminine manner, as

in *Price Waterhouse*, and therefore that Kehrees intentionally discriminated against plaintiff because she was a woman.[2]

Defendant argues that, unlike in *Price Waterhouse*, Kehrees's comment was at least facially sex-neutral because he did not explicitly mention that plaintiff was a woman or assert that her mode of dress was inappropriate for a woman; he is only alleged to have told plaintiff that he did not like the way she dressed. The Court is not convinced that this factor distinguishes this case from *Price Waterhouse*, in which the criticism the plaintiff received concerned matters, such as her use of profanity, that were not explicitly related to her sex, but were apparently galling to certain supervisors only because plaintiff was a woman. *See Price Waterhouse*, 490 U.S. at 235 ("Several partners criticized [plaintiff's] use of profanity; in response, one partner suggested that those partners objected to her swearing only 'because it's a lady using foul language.'"); *see also Lust v. Sealy, Inc.*, 277 F. Supp. 2d 973, 981-83 (W.D. Wis. 2003) (employer's refusal to promote woman based on assumption that she had a family, and therefore would not be interested in moving to take a position out of state, created genuine issue of material fact because "'stereotypical attitudes about women are not legitimate reasons for treating them differently from men'" (quoting *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 524 (7th Cir. 1994)). Given that plaintiff's attire was not unusual or inappropriate for her position, a reasonable factfinder could conclude that Kehrees would not have objected to plaintiff's attire if

---

[2] In reaching this conclusion, the Court has not considered the evidence plaintiff has adduced concerning prior accusations of discrimination against Kehrees. The Court agrees with defendant that at least some of this evidence is likely inadmissible under Federal Rule of Evidence 404—but not necessarily all of it. *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008) (evidence of defendant's discriminatory treatment of other members of the protected group not irrelevant *per se*; district court must analyze evidence on an individualized basis to determine relevance). The Court need not determine now how much of this evidence is admissible because, even leaving all of it to one side, the remaining evidence is sufficient to present a genuine issue of fact for trial.

she were a man, just as certain of the partners in *Price Waterhouse* would not have objected to swearing or other behavior of the plaintiff in that case if she were a man.

But even if defendant is correct that Kehrees's comments are not sufficient by themselves to support a jury verdict of intentional discrimination because they do not sufficiently connect Kehrees's refusal to promote plaintiff to her sex, *see King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (even if evidence showed that employer's reason for adverse action was pretextual, plaintiff's "claim would still fail without 'some minimal showing that the real reason' for the decision was discrimination") (quoting *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298-99 (7th Cir. 2010)), plaintiff's comparator evidence supplies the missing connection, at least for purposes of defeating defendant's summary judgment motion. Plaintiff provides two examples, Eric Hall and Jeff LeRette, of men who worked alongside plaintiff in inventory control and who had similar qualifications but received promotions ahead of plaintiff. Defendant highlights small differences between plaintiff and her proffered comparators, but these differences do not demonstrate that the male comparators were plainly more qualified than plaintiff. To make out a *prima facie* case, plaintiff need only show that her comparators had "similar" qualifications, *Pafford*, 148 F.3d at 669, and Hall and LeRette had similar levels of experience to plaintiff, in terms of the similar duration of their employment at Wal-Mart and the similar job duties they performed as inventory control specialists.

With respect to LeRette, defendant argues that plaintiff cannot recall the name of the person who told her on June 13, 2002, after her upsetting meeting with Kehrees, that he had been promoted ahead of her, and the evidence does not show with any certainty that it was LeRette. The Court fails to see why it matters whether LeRette personally told plaintiff of his promotion or not. Plaintiff has provided evidence showing that LeRette was promoted from inventory

control at the DeKalb store to the MIT program in June 2002, after having been hired as a cashier in October 2000, not long before plaintiff. (*See* Pl.'s Stmt. of Add'l Facts ¶ 10.) That is enough to make the comparison useful, for purposes of making out a *prima facie* case. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (determining whether two employees are similarly situated is "a 'common-sense' factual inquiry—essentially, are there enough common features between the individuals to allow a meaningful comparison?").

With respect to Hall, defendant argues that he is not similarly situated to plaintiff because he was promoted to the MIT program from the position of Department Manager of Automotive, not the inventory control team. Defendant neglects to acknowledge that Hall was promoted to the position of Department Manager of Automotive from the inventory control team, where he worked alongside plaintiff for several months, after they were hired as cashiers at or around the same time. Indeed, Hall followed the same career track (inventory control, department manager, MIT program) that Ronny Hayes recommended for plaintiff—but according to plaintiff, Kehrees was not open to providing plaintiff with a similar opportunity for advancement. Hall is a valid comparator for purposes of plaintiff's claim of refusal to promote from the inventory control team at the DeKalb store.

Even if there are some potentially significant differences between plaintiff and these comparators, to focus too narrowly on those differences would to ignore the Seventh Circuit's instruction to consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765. The "sole question that matters" at the summary judgment stage is "[w]hether a reasonable juror could conclude that [plaintiff] would have [been promoted if she were male], and everything else had remained the same." *See id.* at 764. Viewing the evidence as a whole and in the light most favorable to plaintiff, Kehrees

told plaintiff that he would not promote her because he did not like the way she dressed, but men who worked on the inventory control team alongside plaintiff, and who had a similar level of experience at Wal-Mart, were promoted from the DeKalb store to department manager and/or the MIT program, although it was common for inventory control specialists to dress just as plaintiff did. A jury could reasonably find that plaintiff was treated differently because she is a woman. Plaintiff has produced sufficient evidence to support a jury verdict of intentional discrimination based on Wal-Mart's refusal to promote plaintiff while she worked at the DeKalb store.

### B. Failure to Promote at St. Charles Store Over Jason Bova

Defendant argues that plaintiff cannot prove that Wal-Mart's refusal to promote plaintiff from the St. Charles store was the result of intentional discrimination because the only person plaintiff has identified as being promoted ahead of her there—Jason Bova—was not similarly situated to her. According to defendant, Bova was significantly more experienced than plaintiff: at the time he was promoted to the MIT program in 2004, Bova had worked at Wal-Mart for twenty years and as a department manager for eight, but plaintiff had worked at Wal-Mart for only approximately three years and as a department manager for two.

Plaintiff responds that Bova's longevity does not make him more qualified because it was not a recognized criterion for promotion to the MIT program. Ketcham testified that he did not recall any written criteria, but generally store managers "look at candidates who have approached them and/or candidates who were performing well, and then [ask,] Do they have coachings [*i.e.* disciplinary infractions on their records]; are they reliable; are they a dependable individual; do they perform; do they work well with others." (Olawsky Decl., Ex. 5, Ketcham Dep. at 44:6-45:18.) Ketcham did not mention longevity with Wal-Mart as a factor that store managers took into account, nor has defendant pointed to other evidence that it was. In fact, there is evidence to

the contrary: Hall and LeRette were promoted to MIT although they were relatively recent hires (albeit at a different store). Further, plaintiff points out that Bova had a checkered record at Wal-Mart, marred by occasional disciplinary infractions and critical comments in his performance evaluations (Pl.'s Stmt. of Add'l Facts ¶ 24; Olawsky Decl. Exs. 21-22; *id.*, Ex. 23, Bova Dep., at 40:7-54:23, 66:9-79:13)—and Ketcham mentioned disciplinary infractions, or "coachings," as factors store managers take into consideration in promotion decisions. Based on the evidence that plaintiff was an exemplary department manager upon arriving at the St. Charles store, a reasonable factfinder could conclude that Bova was not better qualified for promotion than plaintiff. Taking all the evidence of plaintiff's tenure at the St. Charles store into account and viewing it in the light most favorable to plaintiff, it is sufficient to support a jury verdict that Wal-Mart's refusal to promote plaintiff to the MIT program from the St. Charles store was based on sex discrimination.

### C. Failure to Promote Based on Applications through Wal-Mart's Management Trainee Career Selection System

Defendant argues that plaintiff cannot prove that Wal-Mart intentionally discriminated against her based on its rejection of certain applications for promotion that plaintiff submitted during her employment at Wal-Mart in the St. Charles store, beginning in 2003 (Olawsky Decl., Ex. 32, ECF No. 64; Pl.'s Stmt. of Add'l Facts ¶ 36), because plaintiff adduces neither evidence that similarly or less qualified men were promoted ahead of her or that there is other evidence of intentional discrimination with respect to these opportunities. But this argument misses the mark because these applications are part and parcel of the claim of failure to promote from the St. Charles store ahead of or along with Jason Bova, who was promoted in 2004. As the Court has already explained, plaintiff has produced sufficient evidence to support a jury verdict of intentional discrimination with respect to her treatment at the St. Charles store.

## II.    PAY DISCRIMINATION

Plaintiff claims that defendant discriminated against her by paying her less than similarly

situated men, who received higher rates of pay and more frequent raises, although they

performed similar work.

> To state a *prima facie* case of disparate compensation, a plaintiff must show that:
> (1) she is a member of a protected group; (2) she was fulfilling her employer's
> legitimate performance expectations; and (3) she suffered an adverse employment
> action in that she was paid a lower salary than a "similarly situated" nonprotected
> [co-worker]. *Hildebrandt v. Ill. Dept. of Natural Res.,* 347 F.3d 1014, 1030–31
> (7th Cir. 2003). To be "similarly situated," [plaintiff] must show that her
> performance, qualifications, and conduct were comparable to the nonprotected
> [co-worker] in "all material respects." *Durkin v. City of Chicago,* 341 F.3d 606,
> 613 (7th Cir. 2003); *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681 (7th
> Cir. 2002).

*Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004).  Determining whether two

employees are similarly situated requires

> a 'common-sense' factual inquiry—essentially, are there enough common
> features between the individuals to allow a meaningful comparison? Put a
> different way, the purpose of the similarly situated requirement is to eliminate
> confounding variables, such as differing roles, performance histories, or decision-
> making personnel, which helps isolate the critical independent variable: [the
> plaintiff's protected characteristic]. . . . The inquiry simply asks whether there are
> sufficient commonalities on the key variables between the plaintiff and the would-
> be comparator to allow the type of comparison that, taken together with the other
> prima facie evidence, would allow a jury to reach an inference of discrimination.

*Humphries*, 474 F.3d at 405; *see Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995) ("The

prima facie case, and specifically [the element requiring evidence that similarly situated

employees without the protected characteristic were treated more favorably], are meant to

identify situations where the 'actions taken by the employer, . . .  if unexplained, are more likely

than not based on consideration of impermissible factors.'" (quoting *Allen v. Diebold, Inc.,* 33

F.3d 674, 678 (6th Cir.1994))).  Relevant factors in the similarly-situated inquiry include

"whether the employees (i) held the same job description, (ii) were subject to the same standards,

(iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Warren v. Solo Cup Co.,* 516 F.3d 627, 631 (7th Cir. 2008). Plaintiff cites a number of comparators who, she argues, were similarly situated to her but treated differently.

### A. Eric Hall—Cashier and Inventory Control Specialist at DeKalb Store

Plaintiff argues that Eric Hall was similarly situated but paid more for his work at the DeKalb store. Like plaintiff, Hall was hired as a cashier in early 2001, but subsequently transferred to inventory control as an inventory control specialist. Plaintiff asserts that, upon transferring to the inventory control department, Hall immediately received a fifty-cent raise, but plaintiff received only a thirty-cent raise, which meant she was still earning less than Hall, although Hall was younger and had less work experience than she did.

As support for her position, plaintiff relies on an "Employment History" spreadsheet obtained from defendant. (Pl.'s Stmt. of Add'l Facts ¶ 4 (citing Olawsky Decl., Ex. 4, ECF No. 44).) To the extent the Court is able to interpret the spreadsheet, it appears to show that Hall received a raise from $7.10 to $7.60 upon transferring to inventory control in July 2001, the last raise he received before leaving the inventory control team. Plaintiff's pay increased to $7.55 in May 2001, then to $8.05 in August 2001 and to $8.50 in February 2002. (Pl's Stmt. of Add'l Facts ¶ 1.) Thus, for about a month, Hall was paid five cents more per hour than plaintiff for performing the same work, before plaintiff received a raise that paid her forty-five cents more per hour than Hall. A reasonable factfinder could not interpret this employment history, by itself, to establish intentional pay discrimination on the basis of sex.[3]

---

[3] During the month that Hall was paid more than plaintiff while they were both working in inventory control, Hall would have made a total of approximately eight dollars more than plaintiff. Defendant does not make the argument, but such a minimal discrepancy is potentially not even an adverse employment action under Title VII. *See Utomi v. Cook Cty.*, No. 98 C 3722, 2001 WL 914465, at *8 (N.D. Ill. Aug.

**B. William Moon and Kevin Schultz—Inventory Control Specialists at DeKalb Store**

Plaintiff argues that William Moon and Kevin Schultz made more than plaintiff while they worked in inventory control at the DeKalb store.

**1. William Moon**

Plaintiff asserts that Moon was "hired into" the inventory control department with plaintiff, "yet was paid $8.63 per hour," more than plaintiff made at any point during her tenure there, and he received additional raises, to $9.10 within three months and to $10 a month later, while he worked there. (Stmt. of Add'l Facts ¶ 5.) As support for this assertion, plaintiff cites Moon's Employment History spreadsheet. (Olawsky Decl., Ex. 6, ECF No. 45.) The spreadsheet shows that Moon began working at Wal-Mart in 1999, he received regular raises during his employment until he separated from Wal-Mart in April 2001, and he was subsequently re-hired to the inventory control team later in 2001. His higher rate of pay when he worked in inventory control with plaintiff plainly reflects his longer (although interrupted) history as a Wal-Mart employee, and under these circumstances, "no reasonable factfinder could conclude that [plaintiff and Moon] were similarly situated for the purposes of [plaintiff's] pay discrimination claim." *See Reid v. Wal-Mart Stores, Inc.*, No. 15 C 6163, 2017 WL 1304080, at *4 (N.D. Ill. Apr. 7, 2017) (reaching a similar conclusion under similar facts). A reasonable factfinder could not interpret this employment history to establish intentional pay discrimination on the basis of sex.

---

14, 2001) ("The *de minimis* nature of this financial loss suggests that it should not be considered an adverse action.").

### 2. Kevin Schultz

Plaintiff asserts that, based on his Employment History spreadsheet, Schultz was hired into the inventory control department in December 2001, but he was paid $8.32 per hour. (Stmt. of Add'l Facts ¶ 6 (citing Olawsky Decl., Ex. 7, ECF No. 46)).

It is not clear from the spreadsheet alone that plaintiff's assertion about Schultz's wages is strictly true; in fact, it appears that Schultz was hired as an Inventory Control Specialist in October 2001 at a pay rate of $8 per hour. He received a raise to $8.32 in December 2001. Plaintiff was hired at $7.25 as a cashier, and she received a raise to $7.55 soon after moving to inventory control in May 2001, another raise to $8.05 in August 2001, and yet another to $8.50 in February 2002. (Pl.'s Stmt. of Add'l Facts ¶ 1.) Thus, there were periods when plaintiff was earning $8.05, while Schultz was earning $8 per hour, and $8.50, while Schultz was earning $8.32. A reasonable factfinder could not interpret this employment history to establish intentional pay discrimination on the basis of sex. Plaintiff has not met her burden to produce sufficient evidence to support a jury verdict of intentional discrimination based on any comparison to Schultz.

### C. Matt Heth, Daniel Browne, Daniel Escobedo, Jason Bova, Kurt Anderson, and John O'Brien—Department Managers at St. Charles Store

Plaintiff argues that Matt Heth, Daniel Browne, Daniel Escobedo, Jason Bova, Kurt Anderson and John O'Brien all received significant increases in their hourly rate of pay within approximately ninety days after becoming department managers at the St. Charles store (Pl.'s Stmt. of Add'l Facts ¶¶ 29, 31-33)—but plaintiff did not receive a similar raise after ninety days as the Department Manager of Stationery at the St. Charles store. Plaintiff's Employment History spreadsheet shows that she received a raise of $1.50, from $8.50 to $10 per hour, immediately upon receiving her promotion to Department Manager in June 2002, but did not

receive another raise until January 2003, a forty-cent raise to $10.40 per hour. (Pl.'s Stmt. of Add'l Facts ¶ 1; Pl.'s LR 56.1 Resp. ¶ 21.) The only evidence plaintiff submits in support of her position that she was treated differently from the alleged comparators are their Employment History spreadsheets.

The evidence shows that not all of these alleged comparators were actually treated more favorably than plaintiff. For example, Bova's Employment History spreadsheet (Olawsky Decl. Ex. 20) shows a series of pay raises, including a forty-cent increase from $8.01 to $8.41 in September 1998, upon promotion to department manager, and a forty-two-cent increase from $8.41 to $8.83 approximately three months later. Considering that plaintiff received a raise of $1.50 per hour upon promotion to department manager, which dwarfs Bova's $0.42 raise, and that their wages increased at more or less similar rates during the years that they worked as department managers, Bova's wage history does not support a reasonable inference that any disparities in their treatment show that Wal-Mart was guilty of intentional discrimination based on an "actual desire to pay women less than men because they are women." *See Loyd*, 25 F.3d at 525.

Similarly, Daniel Escobedo was not treated more favorably than plaintiff. He began his employment with Wal-Mart as a cashier in August 2002, then worked in inventory control and as a sales associate before being made a department manager in June 2006 at a pay rate of $10.69 per hour. (Pl.'s Stmt. of Add'l Facts ¶ 29 (citing Olawsky Decl. Ex. 26).) He received a raise to $11.09 within a few months, then another forty-cent raise to $11.49 in a year. But plaintiff was making $11.95 per hour at that point (Pl's Stmt. of Add'l Facts ¶ 1), so Escobedo's wage history does not create a genuine issue of fact concerning whether Wal-Mart intentionally paid plaintiff less than similarly situated men.

However, a reasonable factfinder could conclude based on the wage history of the other St. Charles department managers whom plaintiff mentions that Wal-Mart intentionally paid plaintiff less than men for similar work. According to his Employment History, Matt Heth started as a department manager at $10 per hour, received a pay raise to $10.50 in approximately three months, and a pay raise to $11.13 in another three months. (Pl.'s Stmt. of Add'l Facts ¶ 29 (citing Olawsky Decl. Ex. 24).) By contrast, it took plaintiff approximately two years, compared with approximately six months for Heth, to reach that pay rate. (Pl's Stmt. of Add'l Facts ¶ 1.) Daniel Browne (*id.* (citing Olawsky Decl. Ex. 25) started as a department manager at $10 per hour and received a raise to $10.40 in approximately three months, another raise to $10.95 in approximately ten months, and yet another raise to $11.95 six months after that. Plaintiff waited seven months for a raise to $10.40, then over a year for another raise, to $10.82, then five more months for a raise to $11.15. (Pl's Stmt. of Add'l Facts ¶ 1.) John O'Brien was hired as a department manager at $12 per hour in August 2000, and he received a raise to $12.48 in approximately three months, and another raise to $12.98 in another nine. (Olawsky Decl. Ex. 27.) Kurt Anderson became a department manager in July 2002, and at that time he received a raise from $9.45 to $10.02. Within approximately three months, he received another raise, to $10.42. (Pl.'s Stmt. of Add'l Facts ¶ 32.) Moon was transferred to the St. Charles store in 2002, two months after Lishamer, to be a department manager. He received a two-dollar raise, from $10 to $12 per hour. (*Id.* ¶ 31.) All of these men worked as department managers at the same store as plaintiff during a similar time frame, but they were treated differently with respect to their wages because they were paid more, their pay increased more quickly, or both. This evidence could support a reasonable inference that plaintiff was treated less favorably with respect to the amount of her compensation and the timeliness of her raises based on her sex.

### D. Colin Matthews

Plaintiff claims that she was paid less than her fiancé Colin Matthews, even though he held "significantly lower responsibility, lower pay grade positions." (Pl.'s Opp'n Br. at 17, ECF No. 72-1.)

Plaintiff and Matthews are not similarly situated. Matthews was hired to perform a different role in the TLE department, with a different "supervisor, district manager, and rate of pay than other departments within Wal-Mart." (Pl.'s LR 56.1 Resp. ¶ 37.) Even if he was paid more than plaintiff and ultimately performed similar work, that was only as a result of the personal and medical issues that prevented him from filling the position for which he was hired, and a reasonable factfinder could not conclude that the pay disparity was based on "an intent to discriminate . . . encompass[ing] an actual desire to pay women less than men because they are women." *See Loyd*, 25 F.3d at 525. But more importantly, Matthews did *not* perform similar work; plaintiff takes pains to point out that he was not a department manager (Pl.'s LR 56.1 Resp. ¶ 39), and he performed work of a "substantially lower" level (Pl's Opp'n Br. at 17). Plaintiff "retains at all times the burden of convincing the fact finder . . . that her employer intended to suppress her wages on account of her sex," and where she relies on "comparing male and female remuneration in dissimilar jobs, this becomes a rather demanding standard." *Loyd*, 25 F.3d at 525, 525 n. 6. Plaintiff is not able to meet this "demanding" standard by comparing her work to Matthews' dissimilar work; there are too many extenuating circumstances which serve as "confounding variables" that prevent a factfinder from "isolat[ing] the critical independent variable," sex. *Humphries*, 474 F.3d at 405.

### CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment [35] is granted in part and denied in part. The motion is denied with respect to plaintiff's claim of

failure to promote from the DeKalb store in 2001 and 2002 and the St. Charles store in 2002, 2003 and 2004, and with respect to plaintiff's claim of pay discrimination based on her disparate treatment as a department manager at the St. Charles store as compared with Matt Heth, Daniel Browne, Kurt Anderson, John O'Brien, and William Moon (but only in his capacity as a department manager at the St. Charles store); those claims remain. The motion is otherwise granted. A status hearing is set for February 21, 2018, at 9:30 am.

**SO ORDERED.**                                          **ENTERED: January 30, 2018**

_____

**HON. JORGE L. ALONSO**
**United States District Judge**